IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 27, 2012 Session

IN RE IZAIAH J.[1] ET AL.

**Appeal from the Juvenile Court for Putnam County**
**No. 1027TPR      John P. Hudson, Judge**

**No. M2011-01848-COA-R3-PT - Filed March 20, 2012**

The trial court terminated father's parental rights to his daughter. We affirm because there was clear and convincing evidence to support the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Shawn Sidwell, Cookeville, Tennessee, for the appellant, Robert S.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Douglas Earl Dimond, Senior Counsel; and Marcie Eubanks Greene, Assistant Attorney General; for the appellee, State of Tennessee, Department of Children's Services.

OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Neicy J. was born out of wedlock on April 18, 2003, to Nicol J. ("Mother") and the appellant, Robert S. ("Father"). In November 2009, the Department of Children's Services ("DCS") removed Neicy[2] from Mother due to her homelessness and inability to care for her children. Neicy was initially placed with Father but, on November 18, 2009, Father asked DCS to remove her because of his upcoming colon surgery. When the DCS case manager

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[2] DCS also removed Neicy's half-brother, Izaiah, from Mother. This appeal concerns Neicy only.

first visited Father's home, she determined that his mental state was questionable. Since November 18, 2009, Neicy has resided in one foster home.

After a hearing on October 28, 2010, the trial court adjudicated Neicy dependent and neglected and made the dispositional finding that she should remain in foster care. DCS developed permanency plans[3] for Neicy, and the court found their requirements to be in the child's best interest and reasonably related to remedying the conditions that necessitated foster care. The initial permanency plan required Father to obtain a comprehensive psychological evaluation, follow all the evaluation's recommendations, keep DCS informed of all his medical needs, surgeries, and special instructions, and sign releases of information so DCS could communicate with service providers. The revised permanency plan required Father to complete a parenting assessment, comply with its recommendations, demonstrate proper parenting techniques after completing parent education, not associate with known drug users, obtain housing, pay rent and utilities for six consecutive months, provide receipts to DCS, allow DCS to conduct random home visits, report anyone staying in his home, have adequate space for Neicy, apply for public housing, if needed, obtain a job or have other means of legal income to support himself and Neicy, provide DCS with documentation of his income, maintain a legal driver's license, obtain a comprehensive psychological evaluation and follow all of its recommendations, keep DCS informed of all his medical needs, surgeries, and special instructions, and sign releases of information so DCS could communicate with service providers. Another revised permanency plan required Father to openly and honestly submit to a full psychological evaluation, follow all of its recommendations, sign releases of information, demonstrate that he is mentally stable to parent Neicy, provide documentation of paid rents and utilities, have a home free of safety hazards and with appropriate sleeping arrangements, and allow random, unannounced home visits.

Per the permanency plans, Father underwent a full psychological evaluation and a clinical parenting assessment with Dr. William Sewell. Dr. Sewell diagnosed Father with a delusional disorder and recommended further treatment that Father refused because he did not believe he had the disorder.

On April 12, 2011, DCS filed a petition to terminate Mother's and Father's parental rights to Neicy. Mother surrendered her parental rights on April 28, 2011. Trial was held

---

[3] Our statutes require the development of a plan of care for each foster child. The plan must include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2).

July 19, 2011.[4]  By final decree entered July 28, 2011, the court found that Father's parental rights should be terminated pursuant to Tennessee Code Annotated section 36-1-113(g)(2)[5] because, despite DCS's reasonable efforts to help him do so, Father failed to complete several of the permanency plans' requirements:

> [H]e has not completed the recommendations from the psychological evaluation for parenting training classes, counseling and psychiatric care, he has not completed the recommendations from his parenting assessment for therapy case management and psychiatric care, he has not demonstrated that he is mentally stable to parent the child and he has a one bedroom apartment that has insufficient sleeping arrangements for the child.

The court specifically adopted DCS's affidavit of reasonable efforts[6] as findings of fact and further found that DCS "made reasonable efforts to assist [Father] in complying with the requirements in the permanency plan by performing a home visit, arranging and paying for a clinical parenting assessment, arranging and paying for a comprehensive psychological evaluation, and making the child available for regular visitation."

Additionally, the trial court based the termination of Father's parental rights upon the persistence of conditions ground stated in Tennessee Code Annotated section 36-1-113(g)(3)[7], finding that:

> [Neicy has] been removed from the custody of [her] parents for more than six (6) months; the conditions which led to [Neicy's] removal from the home of [Father] still exist and other conditions exist which in all probability would cause the child, [Neicy], to be subject to further abuse and/or neglect, making it unlikely that the child could be returned to [Father] in the near future; there

---

[4] The testimony, evidence, and findings of fact from trial will be summarized in greater detail below as relevant to the issues on appeal.

[5] *See supra* note 3.

[6] DCS "employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the [permanency] plan." *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008).  DCS is required to provide for the court's consideration an affidavit that identifies its reasonable efforts. Tenn. Code Ann. § 37-1-166(c); *see In re R.L.F.*, 278 S.W.3d at 317.

[7] Tenn. Code Ann. § 36-1-113(g)(3) allows for the termination of parental rights where a child has been removed from the parent's custody for a period of six months and the conditions which led to the child's removal persist.

is little likelihood that these conditions will be remedied at an early date so that the child can be returned to [Father] in the near future; the continuation of the parent or guardian and child relationship greatly diminishes the child's chance of an early integration into a stable and permanent home and therefore his parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(3).
...

The conditions that prevent [Neicy's] return to [Father's] home are his significant mental health issues, which he refuses to acknowledge or work on through treatment.

Finally, the trial court found that termination of Father's parental rights to Neicy was in her best interest[8] and was warranted because:

[Father] is incompetent to adequately provide for the further care and supervision of the [child] because his mental condition is presently so impaired and is so likely to remain so that it would be unlikely that he will be able to assume or resume the care of and responsibility for the [child] in the near future and therefore his parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(8).

[Father] is diagnosed with a delusional disorder. He rejects the need for treatment and has not followed through with counseling or psychiatric care.

[Father's] mental state would be detrimental to the child, [Neicy], and could permanently affect her development.

Father appeals from the July 28, 2011 final decree.

ISSUES

The trial court found that termination of Father's parental rights to Neicy was necessary based upon the grounds listed in Tennessee Code Annotated sections 36-1-113(g)(2), (3), and (8). Father presents two issues for review which we summarize as follows: (1) Whether the trial court erred in finding that DCS made reasonable efforts to assist him in complying with the permanency plans; and (2) Whether the trial court correctly found by clear and convincing evidence and pursuant to Tennessee Code Annotated section

_____

[8] *See infra* section III.

-4-

36-1-113(g)(8) that Father's parental rights should be terminated on the ground that he is mentally incompetent to adequately provide for the further care and supervision of his child.

STANDARD OF REVIEW

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Pursuant to Tennessee Code Annotated section 36-1-113(l)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, M2004-00999-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *Id.* at 654. As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the

preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

ANALYSIS

I. Reasonable Efforts

Father argues that DCS "failed to make reasonable efforts to assist [him] with following through with the requirements of the permanency plan." DCS responds that it "provided numerous services to [Father] to help him correct those issues that rendered him incapable of adequately parenting his child," but that those services "were ultimately not effective for [Father]. [Father] was not cooperative with [DCS], nor was he compliant with the requirements of the permanency plans."

DCS has "the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home." *In re Tiffany B*., 228 S.W.3d 148, 158 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166). "'Reasonable efforts' means the exercise of reasonable care and diligence by [DCS] to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). "The reasonableness of [DCS's] efforts depends upon the circumstances of the particular case," and in determining whether DCS's efforts were reasonable, the court considers DCS's affidavit and these factors:

> (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to [DCS], (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and [DCS's] efforts.

*In re Giorgianna H*., 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006). However, "parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [DCS] to remove their children from their custody." *Id*.

Here, the record clearly demonstrates that Father continually resisted DCS's efforts to help him because he did not think that he needed help. Natalie Roberts, the foster care case manager, testified as follows:

Q. What reasonable efforts have you made to assist [Father] in complying with the Permanency Plan?

A. He has been referred to Plateau [Mental Health Center], Life Care [Family Services], and the Stephens Center for Parenting Education. He's been given a psychological and a clinical parenting assessment.[9] He's been referred to Personal Growth and Learning; I made the appointment for him. He's been offered on one occasion help with public transportation.[10] He has been offered assistance, if needed, for utilities. He's never taken advantage of it though. And he is given visitation [with Neicy] twice a month on Wednesday.

Ms. Roberts explained that Father did not follow the recommendations from the Plateau evaluation, the full psychological evaluation with Dr. Sewell, or the clinical parenting assessment. Upon Dr. Sewell's recommendation, Ms. Roberts also "set him up an appointment with Personal Growth and Learning for April 1st at 2:30 and he did not show up for that, as well." DCS spoke with Father "about the need to follow through with the recommendations from the psychological evaluations and the parenting assessments and clinical assessments," but Father refused to do so because he adamantly believed "that he only has ADHD" and was not in need of treatment. Ms. Roberts further testified:

Q. One of the [permanency plan] requirements is to demonstrate proper parenting techniques after he completed the parenting education. Did he complete the parenting education?

A. He did not. He refused to do it. He said that he had done it when his oldest child was in [DCS] custody, or when one of his older children were [sic] in custody, so he wasn't going to do it again.[11]

---

[9] DCS paid for these assessments. Also, Father has two forms of insurance, one through TennCare and one "through his disability" that will cover the cost of counseling services.

[10] DCS no longer offered Father transportation assistance after he accused DCS of conspiring with the transportation provider to prevent him from being with Neicy.

[11] This is not the first time that Father's parental rights to a child have been terminated. Father's older daughter was adjudicated dependent and neglected before his parental rights to her were terminated. We note, as the trial court did in its final decree of guardianship, that a parent's showing neglect toward another child in the family or household is one of the statutory factors to consider in determining whether termination of parental rights is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(i)(6).

When asked whether he believes that a parenting education class could benefit him, Father responded that he already completed the class in 2005 and reported to Ms. Roberts that he had done so.

Father refused to follow even the simplest requirements in the permanency plans such as signing medical releases of information:

Q. What was the health issue that you were having at the time you asked that [Neicy] be removed from your custody?

A. I had to have surgery.

Q. What kind of surgery?

A. Colon surgery.
. . .

Q. And why didn't you want to give Ms. Roberts any of those records?

A. My operations had nothing to do with it. The only thing she had asked for was a release from the doctor and that wasn't even the judge's thing. I have provided that . . . .

Q. So you have signed the release for [DCS] to have your medical records?

A. No ma'am. They cannot have my medical records. That doesn't have anything to do with any of my surgeries.

Q. Why don't you want [DCS] to be able to see those records?

A. My personal health issues is [*sic*] not a problem in this and stuff. When the doctor releases me that should be the only thing that you all should be interested in.

Q. Even though that's the reason that [Neicy] came into custody in the first place?

A. If the doctor says I'm fine enough then I don't see. I think they have just about as more authority than anybody does.

In sum, Father simply failed to follow the permanency plan requirements and to take advantage of resources that were offered to him. We have carefully reviewed the record and we conclude that it contains clear and convincing evidence that DCS made reasonable efforts to assist Father in completing the permanency plan requirements and that Father made virtually no effort to rehabilitate himself and to remedy the conditions that required DCS not to return Neicy to his custody.

## II. Termination on the Ground of Mental Incompetence

"A parent's rights may be terminated on the ground of mental incompetence if the court determines, by clear and convincing evidence, that the parent's mental condition is impaired to such a degree that the parent cannot adequately provide care and supervision to the child and it is unlikely that the parent will be able to do so in the near future." *In re Billy D.H.*, M2011-00797-COA-R3-PT, 2011 WL 6935338, at *3 (Tenn. Ct. App. Dec. 29, 2011) (no Tenn. R. App. P. 11 application filed) (citing Tenn. Code Ann. § 36-1-113(g)(8)(B)).

In this case, the trial court found that Father is unable to care for Neicy and that he is unlikely to be able to care for her in the near future because he is diagnosed with a delusional disorder, rejects the need for treatment, and has not followed through with counseling or psychiatric care. Father argues that the evidence does not support the trial court's findings because "there is a difference between delusional belief and delusional behavior." The trial court found that "[r]egardless of whether it is beliefs or behavior, it has kept [Father] from accepting treatment." Father further argues that "[DCS] failed to prove how [his] beliefs would harm his child." We disagree because the record contains clear and convincing evidence that Father's beliefs *and* behavior are delusional, and, more importantly, that his untreated mental condition prevents him from adequately parenting Neicy and would adversely affect her if she were to be returned to his custody.

Father believes, among other delusions, that DCS stalks him, conspires against him, and uses sonar pulsinators[12] to eavesdrop on his conversations.[13] He also expresses concerns

---

[12] Q. Well, tell me about the sonic pulsinators that [DCS] has used to listen to you?
A. Well, let's just say they have been used.
Q. What are they?
A. They're bionic ears.
Q. Bionic ears?
A. Yes.
Q. Who uses them? Who's used them against you?
A. Some of your people from Nashville.
Q. Who precisely from Nashville?

(continued...)

that a military monitoring device has been implanted into Neicy's lazy eye and that her milk has been poisoned. Brittany Ferrar, a foster care team leader who had been working with Neicy for twenty months, testified that Father spoke about his delusional theories in front of Neicy during their visitation time. Ms. Roberts also detailed her observations of Neicy and Father's interaction:

> Q. And his concern is that someone or some agency or agent with DCS or the government is directing technology at him?
>
> A. I'm not sure if it's just [DCS] or if it's the government in general. But, yes, he believes that [DCS], I don't know who else is involved, is using the sonar pulsinators to listen.
>
> Q. All right. Now tell me exactly, in your history with him, how has that affected him being able to parent his child that you've observed?
>
> A. During visits he doesn't pay attention to her. At times he inspects the room not paying any attention to Neicy. He's talked to her about it at times, which is inappropriate and he has to be redirected.
>
> Q. And what does he do when he's redirected, does he act appropriate after being redirected?
>
> A. For a while. And then sometimes he'll start back with that and sometimes he won't.

Dr. Sewell, a psychologist/health service provider at Psychological Services of Jackson, Tennessee, performed a full psychological evaluation for parenting on Father. Dr. Sewell's deposition testimony, which included the report of his evaluation, was entered as

---

[12](...continued)
A. One that drives a little gold car and it had Davidson County tags. She carried it out after the second visit I went to and I could have sworn it was you and her both sitting back there using it and a young man, in your office.

[13] Father accused Ms. Roberts of spying by driving by his home in her husband's truck. He accused, in open court, another DCS employee (who has never been involved in this case) of stalking him in a gray jeep. He accused two of DCS's attorney's sisters of using listening devices near his apartment. DCS had to relocate the scheduled visitations between Father and Neicy because Father believes that McDonald's and DCS have conspired against him. Father states that six of his own investigators relayed this information to him.

-10-

an exhibit at trial. As to Father's mental impairment such that he cannot adequately provide care and supervision to Neicy, Dr. Sewell opined as follows:

Q. Is a person with a delusional diagnosis considered a danger to himself or to his children?

A. The problem is in judgment. If they–you know, in this case, he can misinterpret what's going on around him. And based on at least one incident he described to me, he can react in a way that would put people in danger, such as shutting a child off from contact with others because they're afraid if they go outside they're going to have a problem with the–with an individual or that the–the device that is going to cause a problem. So the children can be isolated from interaction with others. And, also, can be prevented from taking medicines because it's assumed that the medication is, in fact, harmful to them when it is not harmful to them, that sort of thing.[14]

Q. So in your opinion, until [Father] were to start receiving treatment, it would be dangerous for him to have [Neicy] in his care?

A. Yes. Is there imminent danger, like if [Neicy goes] in his care and he's there–[she is] there for a weekend, and the first weekend there's no problem, that kind of thing, it's not imminent in that sense. But there's a probability that over a period of a number of visits something of the nature that I've previously spoken to will occur.

Q. Okay.

A. There was–there was one other problem. I know you're not asking this question, but I need to kind of emphasis [*sic*] this. He made a comment to me . . . that he would be sleeping with [Neicy]. He didn't find anything wrong with that, and this is a seven year old girl. And that bothered me . . . .
. . .

Q. Do you think [Father] would ever be able to parent his child without any help with his delusional disorder?

_____

[14] The record contains evidence that Father generally refuses prescribed medication. For example, he has been diagnosed with ADHD and admits that he has ADHD, but he refuses to take medication for it. Dr. Sewell noted that the combination of untreated hyperactivity, attention difficulties, and concentration difficulties with delusional difficulties only compounds Father's mental problems.

A. Only on and off temporarily. And it would be dangerous over time without the therapy and psychiatric care.

Additionally, Dr. Sewell noted that "there's some evidence from the social history that [Father] is not very strongly attached to his daughter" because "[h]e just wasn't very reactive to her in a positive sense in several situations," but that "emotional and attachment kinds of therapies" would aid Father in "engag[ing] in a more positive and emotional and affectional way with his child."

As to the likelihood of Father's future ability to adequately provide care and supervision to Neicy, Dr. Sewell's diagnostic impressions were that Father's delusional disorder is "not very amenable to treatment" and is an ingrained, fixed delusion[15] that Father has had for some time, but that "it can be treated psychiatrically and by counseling." Treatment, however, would only be effective if Father were receptive to receiving it, and Dr. Sewell stated that "at the present time the probability is very low that [Father] would agree that he needs treatment" because "[h]e doesn't think there's a problem," "doesn't see the need for change," and that Father's "chance of improvement at this point is pretty low." Because "[Father] is very opinionated and believes that other persons are spying on him," Dr. Sewell predicted that "he is likely to react to persons trying to help him in a negative way and to avoid treatment or assistance for his daughter that would be necessary to her development."

The unrebutted testimony of Ms. Ferrar, Ms. Roberts, and Dr. Sewell, along with other unrebutted evidence in the record, clearly and convincingly supports the trial court's finding that Father is mentally incompetent to care for Neicy and that he is unlikely to be able to care for her in the near future. Because he refused treatment for his delusional disorder, Father never demonstrated that he was mentally stable to parent Neicy. DCS met its burden pursuant to Tenn. Code Ann. § 36-1-113(g)(8).

While we affirm the trial court's decision that termination of Father's parental rights is appropriate pursuant to Tenn. Code Ann. § 36-1-113(g)(8), we note that Father did not challenge the trial court's determination that termination of his parental rights is also appropriate pursuant to Tenn. Code Ann. § 36-1-113(g)(2) and (3). These two subsections provide independent grounds for termination of Father's parental rights, regardless of our decision concerning subsection (g)(8).

---

[15] Dr. Sewell defined a fixed delusion as one that has "occurred over a long period of time and is very intractable. It's not likely to change at all without treatment and may get worse."

III. Best Interest

Having concluded that DCS made reasonable efforts to assist Father and that clear and convincing evidence supports the statutory grounds upon which Father's parental rights were terminated, we must consider whether it was in Neicy's best interest to terminate Father's parental rights. In making this determination, the trial court was required to examine the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113(i). Ascertaining whether termination is in a child's best interest is necessarily a fact-intensive inquiry. *In re Giorgianna H.*, 205 S.W.3d at 523. Moreover, the best interest analysis "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.*

The record contains ample testimony that Neicy's best interest would be served by remaining with the foster parents with whom she has lived since November 2009. In determining that termination of Father's parental rights is in Neicy's best interest, the trial court made the following findings:

[Father] has not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent.

[Father] has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible.

A change of caretaker and physical environment is likely to have a negative effect on [Neicy's] emotional, psychological, and/or medical condition. [Neicy has] had significant behavioral problems in the past and needs close supervision and a very structured environment.

[Father] has committed brutality and physical, sexual, emotional or psychological abuse or neglect toward other children in the family or household. He has had other children removed and placed in foster care.

[Father's] mental and/or emotional status would be detrimental to the child and/or prevent him from effectively providing safe and stable care and supervision for the child.

[Father] has not paid a reasonable portion of [Neicy's] substitute physical care and maintenance when financially able to do so. [He has] not provided clothing, toiletries, school supplies, toys or other items [Neicy needs] on a regular basis.

[Father] continues to make lifestyle choices that prevent [him] from being able to parent [Neicy] or to provide a home for [her].

[Neicy] is placed in a foster home that wishes to adopt [her]. The testimony indicates that this is a wonderful potential adoptive home.

[Neicy] ha[s] established a strong bond with the foster parents.

[Neicy] ha[s] expressed a desire to be adopted by the foster parents.

[Neicy's] counselor ha[s] opined that it is in [Neicy's] best interest to establish permanency for the [child] as soon as possible through adoption.

[Neicy] need[s] to be released from the stigma of being [a] foster [child].

Father does not take issue with the trial court's best interest determination, and we find that it is supported by clear and convincing evidence.

CONCLUSION

For the reasons discussed above, we affirm the trial court's decision. Costs of appeal are assessed against the appellant, Robert S., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE